NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13552


COMMONWEALTH  vs.  LATARSHA L. SANDERS.



Plymouth.     March 6, 2026. - August 6, 2026.

Present:  Budd, C.J., Gaziano, Kafker, Georges,
& Wolohojian, JJ.



Homicide.  Criminal Responsibility.  Mental Health.  Evidence,
    Medical record, Hospital record, Exculpatory, Expert
    opinion, Hearsay, Relevancy and materiality, Argument by
    prosecutor.  Witness, Expert.  Practice, Criminal, Hearsay,
    Argument by prosecutor, New trial, Capital case.




Indictments found and returned in the Superior Court
Department on March 30, 2018.

    The cases were tried before William F. Sullivan, J.


    Robert F. Shaw, Jr., for the defendant.
    Melissa W. Johnsen, Assistant District Attorney, for the
Commonwealth.


    GAZIANO, J.  In early February 2018, the defendant stabbed

to death her two sons, eight year old Edson "Marlon" Brito and

five year old La'Son Brito.  The victims were found in separate

bedrooms, swaddled in sheets and blankets, having suffered

multiple, horrific knife wounds.  There is no doubt the defendant committed these incomprehensible crimes.  The sole issue before a Superior Court jury was whether she lacked criminal responsibility.  After trial, the jury convicted the defendant of two counts of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty.

On appeal, the defendant contends that the judge impeded her ability to present fully a criminal responsibility defense by excluding relevant medical records, admissible under G. L. c. 233, § 79 (§ 79), documenting postarrest diagnoses or treatment of mental illness.  The defendant argues also that several statements made during the prosecutor's closing argument were improper and prejudicial.  Further, she requests that we exercise our extraordinary authority, pursuant to G. L. c. 278, § 33E, to order a new trial or reduce the verdicts.

For the reasons that follow, we hold that the exclusion of the defendant's relevant medical records relating to the diagnoses or treatment of mental illness constituted prejudicial error, and as a result, the defendant is entitled to a new trial.

1.  Background.  a.  Facts.  We summarize the facts the jury could have found, reserving certain details for later discussion.  In February 2018, the forty-three year old

defendant lived in a third-floor apartment in Brockton with Marlon, La'Son, and her fifteen year old daughter, Tamia Sanders Brito. The defendant's eldest daughter, Shalea Sanders, also lived in Brockton with children of her own. The victims' father, Edson Brito, did not live with the family. The defendant's mother, Erlene Sanders, lived in Randolph.[1]

In addition, the defendant had a seventeen year old son, Kadeem Sanders Alfred. Following a disagreement with his mother over household expenses, Kadeem moved out of the defendant's apartment to live with his girlfriend. Although she took away his key, the defendant told Kadeem that he could move back in at any time. Kadeem's father, Ixer Alfred, lived in Fall River, and was no longer close to the defendant.

Prior to February 2018, the defendant, by all accounts, was a loving, caring, and affectionate mother. She "put all of [her children] first," and had never been violent with Tamia, Kadeem, Marlon, or La'Son.

The defendant did not have a documented history of mental illness prior to the murders, a fact emphasized by the Commonwealth. She had, however, become obsessed with a secret

---

[1] For the sake of clarity, we refer to the family members by their first names. We use the victim's name Marlon (as did his family) to distinguish him from his father. La'Son's name is spelled in various ways throughout the record; we refer to him as "La'Son" based on information in the record that suggests this is the correct spelling.

society called "the Illuminati," fueling her interest by watching videos posted on the Internet "[twenty-four] hours a day." According to the defendant, the Illuminati ruled the world by "sacrific[ing] human beings" and killed by means of "chemical bombs." The defendant was fearful that the Illuminati were "out to get" her and her children. Responding to this perceived threat, on an unspecified date, the defendant "rounded up the kids" and fled to Connecticut. She also feared voodoo, a practice she associated with Kadeem's father, Ixer.

The defendant killed her children sometime between February 3 and 5, 2018. On Friday, February 2, the defendant and her two young sons spent the night with her mother, Erlene, in Randolph. On Saturday morning, February 3, the defendant returned to her Brockton apartment with the boys to retrieve clothing and drove back to Erlene's house, accompanied by Tamia. Later that day, the defendant brought Marlon and La'Son to a Taunton hospital due to concerns that they had contracted the flu. Despite plans to pick up Tamia at Erlene's house on Saturday, the defendant arrived on Monday morning, February 5, by herself.

By then, the defendant's appearance and behavior had changed. She told Tamia that she needed to protect Marlon and La'Son from their grandmother and her older sister Shalea because she feared that they would poison the children. Tamia observed that the defendant's clothes were disheveled, with

"[o]ne pants leg . . . up and one down." The defendant's eyes appeared dark, her lips dry, and her breathing heavy and abnormal. She spoke in a "mean" and "[s]tatic" voice, which Tamia characterized as "very forensic." Of further concern, the defendant slapped her mother across the face, something Tamia had never before witnessed.

Leaving her mother's house, the defendant drove her car, accompanied by Tamia, to Shalea's apartment. During the drive, the defendant explained to Tamia that they were going to "beat [Shalea] up." Tamia, frightened by the defendant, sat in the back seat. Once there, Tamia ran from the car to warn her sister. The defendant lunged at and hit Shalea. Yelling at her mother to stop, Tamia was eventually able to break them up. The defendant then urged Tamia to come home with her because she was not going to "do[] it alone." Tamia refused.

On Monday, February 5, at 12:10 P.M., emergency medical technicians (EMTs) were dispatched to the defendant's apartment building for a suspected seizure. EMTs found the defendant seated on the porch rocking back and forth under a blanket. After assessment, the EMTs placed her on a stretcher for transport to a Brockton hospital with a chief complaint of behavioral issues. The defendant began to scream, flail her arms, kick her legs, and throw herself back and forth. Asked

what was wrong, the defendant responded that "Akeem" (the name heard by the EMT) and his father were trying to kill her.

Police officers, also responding to the apartment building, searched the defendant's home. They discovered La'Son's body tucked into bed in a bedroom adjacent to the kitchen. He was "motionless," "cold," and "stiff," with his eyes "glazed over," indicating he had probably been "deceased for quite some time." The five year old was covered in blankets and a Spider-Man bathrobe with an elastic bandage wrapped tightly around his neck. He suffered blunt force injuries to his face and back, along with severe stab wounds to his neck and chest that penetrated his external jugular vein, cervical spinal cord, heart, lungs, diaphragm, and liver. In addition, there were postmortem injuries consisting of over eighty superficial incised abdominal wounds and facial skin peeling, which was possibly caused by the rubbing of a corrosive chemical, such as bleach. A candle, broken into two pieces, had been shoved down La'Son's throat, deep into the esophagus.

On the floor of another bedroom, officers located Marlon's lifeless body wrapped in several layers of bedding with his bare feet sticking out. He had suffered an "overwhelming amount" of sharp force injuries to the neck -- transecting the carotid artery, jugular veins, trachea, and spinal cord. He also had stab wounds to the chest cavity that fractured ribs and

punctured the heart and lungs.  Like his younger brother, Marlon had been deceased for "a little while."

There was also evidence that the defendant had cleaned the apartment after killing Marlon and La'Son.  Police officers noticed a strong odor of cleaning fluids on entry and found bottles of ammonia and bleach on the kitchen table near a bloodstained mop and a cardboard box filled with bloody bedding. In addition, there was a surprising absence of blood near the bodies considering the number and extent of sharp force wounds inflicted on both victims.

On further search of the apartment, officers discovered a large kitchen knife, visibly bloodstained (with Marlon's blood), in the kitchen sink.  In the defendant's bedroom, officers flipped a mattress, revealing that the underside was bloodstained (again with Marlon's blood).  Hidden under the mattress were two more knives; on one of these knives, trace amounts of La'Son's blood were later detected.  The bathroom sink, floor, and bathtub were also stained with the victims' blood.

Meanwhile, the defendant arrived at the hospital emergency department at 1:10 P.M. with signs of emotional distress, including moaning, yelling, and expressing fear of "something or someone."  Dr. Erik Deede, the attending physician, diagnosed the defendant with anxiety and stress reaction.  He noted, "she

does not appear to be psychotic." To calm her agitation, Deede administered a sedative (lorazepam), which reduced her wailing and screaming.

At 1:15 P.M., State police Sergeant Shaun Bellao and Brockton police Detective Ernie Bell interviewed the defendant at the hospital. In the thirty-five minute interview, the defendant claimed that her eldest son Kadeem and his father, Ixer, had stabbed the victims. She insisted, "I didn't participate in nothing. I was trying to stop it." Responding to police allegations, she posed the question, "Why would I hit the children? They're my children." The defendant detailed (in a disjointed manner) how Kadeem and Ixer arrived at her apartment at some point that weekend. Ixer, armed with a knife, stabbed La'Son "all over," and Kadeem stabbed "his own brother[]" Marlon. She attempted to stop them by jumping on Ixer's back but was hit on the back of her head with a frying pan. She left the apartment to inform police, driving by the police station four times, but did not go inside or call because she was scared, as there were "people" following her. When she returned to the apartment, the doors were open. She found Marlon and La'Son in different bedrooms. The boys "wouldn't get up." According to the defendant, Ixer killed them because he was angry with her for refusing to let him claim the victims as dependents on his tax return.

The interview ended at 1:50 P.M. Deede did not see a need for additional medical workup or treatment. At 2:26 P.M., he discharged the defendant to police custody because he had been assured that she would be in a safe place, unable to hurt herself or others, and that, if released, she would return to the hospital for a mental health evaluation.

Thereafter, officers transported the defendant to the Brockton police department for an interview with Bellao and Brockton Detective Santiago Cirino. In this one hour and fifty-minute interview, which was audio-visually recorded, the defendant continued to claim that Ixer and Kadeem went to her apartment uninvited, attempted to kill her, and murdered the boys. According to the defendant, Ixer stated, "I'll show you something." He then retrieved a knife and started stabbing Marlon. As this was happening, the defendant was being held down. She was told, "You're just going to watch. You're going to watch this." She denied stabbing her children, insisting, "Nothing would make me want to do that." Again, she claimed that this was a fight with Ixer over "the income tax." Questioned about Kadeem's motive, the defendant offered that "he was always angry."

Pressed by the investigators to "[t]ell [them] what happened to those babies," the defendant responded, "All right, I'll tell you." She proceeded to provide the officers with

multiple jumbled and incoherent versions of the events. Although difficult to follow, the defendant explained that the children were murdered as part of a "ritual." She stated that she did not know who stabbed Marlon, but "the boy had to be done yesterday." The defendant attributed the killing to "[a] couple of people" on her Facebook social media page. The defendant claimed Ixer initiated the ritual. She denied participation, stating, "I wouldn't do that. I was there to watch." A short time later, the defendant admitted that she stabbed Marlon because of "that voodoo stuff." The defendant explained that she stabbed both children but "[n]obody was supposed to be getting hurt," as Ixer assured her that he "just wanted a little blood from them." The ritual, she stated, is performed to "get to the afterlife" or achieve "eternal life." The defendant did not understand the ritual but followed the instructions of "bad people" communicating to her through text messages. The ritual is somehow connected to the Illuminati, a group she described as "the enlightened people." She learned through videos that stabbing her children would make the Illuminati "happy."

The defendant stated that she "only killed one baby," Marlon. He was stabbed in the legs and chest with a kitchen knife. She admitted to then stabbing La'Son in the chest because she had "failed" with Marlon. Afterward, she bathed the children, gave them rice and ginger ale, wrapped them in a

"huge" heating pad and "tried to fix them up and make sure they [were] still living."

After the interviews, officers searched the defendant's vehicle and recovered a yellow notebook.  In the notebook, the defendant's listed goals included writing books, making money through an online crowdfunding page, and becoming famous.  The defendant also wrote about Satan and evil, incorporating the word into the letter "E" in Edson Marlon's name, and using the phrases "evil son," "evil's living life large," and the "devil's everywhere run save."

Following her arrest, in several recorded jailhouse telephone calls between the defendant and members of her family, the defendant expanded upon some of these ideas.  For example, in March 2018 calls, the defendant mentioned her plan to write a book and repeatedly described herself as evil.

b.  The defendant's case.  At trial, in support of her defense that she lacked criminal responsibility, the defendant offered the expert testimony of Dr. Thomas Deters, Ph.D., a clinical neuropsychologist affiliated with McLean Hospital. Deters evaluated the defendant to determine her psychiatric condition.  The evaluation included two interviews, which were spaced one month apart and lasted a combined nine hours, along with seven hours of neuropsychological testing and a review of thousands of pages of postarrest mental health treatment

records.  The medical records were obtained principally from her incarceration at the Massachusetts Correctional Institution, Framingham (MCI-Framingham), and her commitment pursuant to G. L. c. 123, § 18 (a), to the Worcester Recovery Center and Hospital (WRCH).  Deters also reviewed a report filed with the court by Dr. Stacey Fiore, Psy.D., a psychologist hired by the Commonwealth and not called to testify.[2]

Deters opined that the defendant was "grossly psychotic" at the time she killed her children, diagnosing her with "schizophrenia spectrum and other psychotic disorders."  He explained that psychosis can be idiopathic (of unknown origin) or caused by certain medical conditions, such as hyperthyroidism or vitamin D deficiency -- both of which the defendant had.

---

[2] Fiore diagnosed the defendant with mental illness "best characterized as Schizophrenia, Paranoid Type."  In her opinion, the "totality of information" indicated that "prior to, and after the offenses, [the defendant] was experiencing severe symptoms of mental illness" and that, "[g]iven the nature of her illness and type of symptoms she exhibited (i.e., fixed delusional beliefs), . . . it is highly likely that she was also symptomatic around the time of stabbing her sons."  Fiore, citing conflicting information, was unable to form a definitive opinion whether the defendant lacked substantial capacity to appreciate the wrongfulness of her actions or conform her behavior to the requirements of the law.  Fiore wrote that the defendant's thinking "departed from reality"; she was fixated on conspiracy theories and held delusional, paranoid beliefs.  Moreover, "the fact that [the defendant] placed a candle in her son's throat is bizarre in nature."  Fiore, however, noted that the defendant's attempts to destroy evidence, and blame Kadeem and Ixer, indicated an appreciation of the wrongfulness of her actions.

Deters found evidence of psychosis from the defendant's notebook entries, the gruesome injuries she inflicted on Marlon and La'Son, and the "bizarre" conditions in which she left the bodies (including her insertion of a candle into La'Son's throat).

He explained that the defendant's attempts to clean the crime scene and deceive police officers did not change his opinion because symptoms of psychosis may wax and wane.  Given the amount of time the defendant was present inside her apartment over the weekend, she may have become more lucid, realized what she had done, and attempted to cover it up.  In conclusion, he testified to a reasonable degree of professional certainty that, as a result of mental disease, the defendant lacked substantial capacity to appreciate the criminality of her conduct and to conform her conduct to the requirements of the law.

c.  Procedural history.  On March 30, 2018, the defendant was indicted on two counts of murder in the first degree, in violation of G. L. c. 265, § 1.[3]  In December 2020, the defendant

---

[3] The defendant was also indicted on one count of willfully misleading police officers in violation of G. L. c. 268, § 13B. After the jury found the defendant guilty on this count, the trial judge sentenced the defendant to a State prison term of from nine to ten years, to be served concurrently with the murder sentences.

filed notice of her intent to rely on a defense of lack of criminal responsibility.  Following a nine-day trial in the Superior Court, on December 27, 2022, the jury convicted the defendant of two counts of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty.  On each count, the judge imposed concurrent mandatory sentences of life imprisonment without the possibility of parole.  Thereafter, the defendant filed a timely notice of appeal.

2.  Discussion.  The defendant raises two claims of legal error.  First, she contends that the judge erred in excluding the entirety of her postarrest medical records offered in evidence under § 79.  Second, she argues that the prosecutor's closing argument exceeded the bounds of proper argument by injecting prohibited personal opinions, inflaming the jury's emotions, and misstating evidence.[4]

a.  Exclusion of mental health records.  i.  Procedural history.  At a pretrial hearing on December 1, 2022, defense counsel indicated that he intended to introduce medical records

---

[4] Because of the result we reach, we need not address the defendant's request that we exercise our extraordinary authority under G. L. c. 278, § 33E, to reduce her convictions of murder in the first degree.

obtained from MCI-Framingham and WRCH.[5]  He reasoned that because the defense expert, Deters, would be referring to the content of those medical records, he should be permitted to introduce the records "in case the jury want[ed] to look at [them]."  The judge expressed concern about requiring the jury to sift through thousands of pages of medical records and asked counsel "to figure out the best way to . . . highlight" important records. Defense counsel indicated that he would be "perfectly happy" as long as Deters could say, "I looked at the report of Dr. [So-and-So] from Framingham.  That was part of the basis for my opinion."  The judge allowed the prosecutor additional time to review the records and raise any objections.

In his opening statement, defense counsel previewed portions of the MCI-Framingham and WRCH medical records.  He emphasized that the records documented the defendant's "episodes of psychosis" and the facilities' attempts to "stabilize[] her from her insanity."

---

[5] Previously, in January 2021, the parties filed a joint request for "all records, including medical," concerning the defendant that were kept by MCI-Framingham and WRCH from February 4, 2018, to the present, subject to a protective order. After the request was granted and summonses were issued to the respective keepers of records, in February 2021, MCI-Framingham and WRCH submitted the requested medical records to the court. In November 2022, one month before trial, a judge modified the protective order to allow counsel to copy "presumptively privileged records."

On the fifth day of trial, defense counsel, anticipating that the prosecutor might object to portions of Deters's direct examination referring to the contents of the defendant's medical records, raised the issue whether the medical records were admissible. At this time, defense counsel only referenced the WRCH records in his request. He stated, "If the reports are marked as exhibits . . . it's part of the record and therefore Dr. Deters can testify in terms of what's in those reports that affected his opinion . . . ." Later that day, defense counsel argued that Deters should be permitted to refer to properly admitted "record[s] in evidence," and noted that he was not required to call the treating physicians to the witness stand. The judge provided the prosecutor with an opportunity to identify inadmissible portions of the medical records.

The next day, the prosecutor filed a motion in limine to limit Deters's testimony and exclude "irrelevant" medical records documenting the defendant's postarrest mental health history. The prosecutor argued, "[The defendant's] mental health status almost two years after the murders is not an appropriate or relevant base for her mental health status at the time of the murders." She also raised a hearsay objection.

The judge held a hearing on the Commonwealth's motion in limine to limit the defense expert's testimony. In brief, the Commonwealth objected to the admission of medical records from

"an irrelevant time frame" and "inadmissible hearsay" in the form of statements by the defendant's mother contained within the medical records.  Defense counsel moved to introduce the medical records that had been subpoenaed to the court from MCI-Framingham and WRCH.  He argued that Deters would testify that "those records were significant for him, informing his professional opinion, and that's highly admissible."  Defense counsel insisted, "I've got the right to introduce records that were properly subpoenaed to the Clerk's Office."  The judge raised a concern about allowing an expert witness to testify on direct examination to potentially unreliable information contained in medical records.

While deferring a final ruling, the judge rejected the Commonwealth's argument that the medical records "are too far removed" from the time of the murders to be relevant to criminal responsibility.  He ruled that, assuming Deters relied on the records to formulate an opinion, and if "there was no other objection," he would allow the records in evidence.

The next day, the judge denied the defendant's motion to admit the MCI-Framingham and WRCH psychiatric treatment records.  In a written order, the judge addressed portions of Deters's proposed direct examination.  He ruled that "facts or data or opinions" from the records "may be elicited only by the

Commonwealth on cross-examination and, where this door has been opened by the Commonwealth, by the defendant on redirect."[6]

ii. <u>Analysis</u>.  The first step of our analysis is to determine whether our common-law evidentiary rule limiting direct examination testimony of an expert witness precludes admission of the defendant's medical records.  Concluding that this rule of evidence does not bar admission of the medical records, we address the Commonwealth's argument that the records, in any event, were not admissible under § 79.  Finally, we consider whether the defendant was prejudiced by an adverse ruling.

A.  <u>Limits on direct examination of expert witness</u>.  Expert witnesses may base their testimony on "(1) facts personally observed; (2) evidence already in the record[] or which the parties represent will be admitted during the course of the proceedings, assumed to be true in questions put to the expert witnesses; and (3) facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion" (quotation and citation omitted).  <u>Commonwealth</u> v. <u>Markvart</u>, 437 Mass. 331, 337 (2002).  See Mass. G. Evid. § 703 (2026).  As to the third

---

[6] The prosecutor did not question Deters about the contents of the MCI-Framingham or WRCH records.  As a result, the door to admission was never opened.

category, an expert testifying on direct examination may not inform the jury about the facts and data that he or she considered in formulating an opinion "that were not in evidence but that would be admissible with the right witness or proper foundation" (citation omitted). Commonwealth v. Goddard, 476 Mass. 443, 448 (2017). See Commonwealth v. Jaime, 433 Mass. 575, 577 (2001); Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 531 (1986). "The purpose of this limitation . . . is to prevent the proponent of the opinion from import[ing] inadmissible hearsay into the trial" (quotation and citation omitted). Commonwealth v. Piantedosi, 478 Mass. 536, 543 (2017). "The thrust of [our] rule is to leave inquiry regarding the basis of expert testimony to cross-examination" (citation omitted). Commonwealth v. Barbosa, 457 Mass. 773, 785 (2010), cert. denied, 563 U.S. 990 (2011).

Here, the judge ruled that the defendant's MCI-Framingham and WHRC medical records were not admissible unless the prosecutor "opened the door" on cross-examination. Thus, he applied our common-law evidentiary rule relating to facts and data not in evidence used by an expert witness to formulate an opinion. See Department of Youth Servs., 398 Mass. at 527, 531-532 (expert allowed to state his opinion based on review of records obtained from secure facility, without testifying to

underlying facts and data, where "[n]one of the reports was offered in evidence").

This was error. Defense counsel had moved to admit the medical records in evidence prior to Deters's testimony. The judge, at that point, should have determined whether the medical records, which had already been delivered to the clerk's office, were admissible under § 79. See Commonwealth v. Wall, 469 Mass. 652, 667 (2014) (§ 79 "allows admission of the substantive content of hospital records because of the presumption of reliability which attaches to statements relating to treatment and medical history in these records" [citation omitted]); Commonwealth v. Francis, 450 Mass. 132, 139 (2007), S.C., 477 Mass. 582 (2017) (medical records, once delivered to clerk's office pursuant to § 79, "are treated as any other evidence," and "[a]ll or portions thereof may be offered in evidence by the proponent"). If admissible, in whole or in part, Deters could have testified to the defendant's documented history of mental illness "already in the record[]." Markvart, 437 Mass. at 337. See Goddard, 476 Mass. at 448 ("where facts or data are already admitted in evidence, . . . it is permissible for the expert witnesses to reference that evidence in their own expert testimony" [quotation and citation omitted]). See also Piantedosi, 478 Mass. at 539-540 (forensic psychiatrist opined on defendant's lack of criminal responsibility based in part on

medical records from psychiatric treatment at county jail and State hospital, which had been introduced by defendant).

The case of Commonwealth v. Chappell, 473 Mass. 191 (2015), is instructive. In Chappell, the defendant contended that the judge impermissibly limited direct examination of his mental health expert regarding the contents of medical records that included diagnoses and opinions about the defendant's mental state. Id. at 192, 202-203. The medical records, however, "were not in evidence and the defense did not wish to introduce them in evidence" (emphases added). Id. at 202-203. As the trial judge in Chappell appropriately pointed out, "if the defense introduced the defendant's medical records in evidence as an exhibit," the defense expert -- and any other expert witness -- "would then be entitled to testify concerning any opinions or other information contained in them." Id. at 203. Defense counsel declined to introduce the voluminous medical records. Id. As a result of this strategic decision, defense expert witnesses were precluded from testifying, on direct examination, to opinions and other information contained in the medical records. Id. at 202-203. We upheld the judge's decision to limit the expert's direct examination and declined to apply an exception to our common-law evidentiary rule. Id. at 203-204. There was no error because defense counsel "would have been able to elicit from the defense expert on direct

examination the opinions and other information from the defendant's medical records in which he was interested by first introducing those medical records in evidence." Id. at 204. Defense counsel, in the instant case, attempted to follow this blueprint, by first introducing the medical records in evidence, to no avail.

B. Medical records. On appeal, the Commonwealth argues that the defendant's medical records were not admissible under § 79. Section 79 provides, in relevant part, "Records kept by hospitals . . . shall be admissible . . . as evidence in the courts of the commonwealth so far as such records relate to the treatment and medical history of such cases . . . ." G. L. c. 233, § 79. The statute "excepts certain hospital records from the common-law rule against hearsay evidence." Commonwealth v. Cole, 473 Mass. 317, 321 (2015), overruled on other grounds by Commonwealth v. Wardsworth, 482 Mass. 454, 464 n.18 (2019). The hearsay exception is premised on "the presumption of reliability which attaches to statements relating to treatment and medical history in these records." Bouchie v. Murray, 376 Mass. 524, 528 (1978). But that is not to say this presumption automatically renders all hospital records, in their entirety, admissible. See Wall, 469 Mass. at 667-668. Rather, a hospital record is admissible if the proponent establishes that (1) the document is the type of record contemplated by

§ 79; (2) the information is germane to the patient's treatment or medical history; (3) the information was recorded from the personal knowledge of the entrant or from a compilation of the personal knowledge of those who are under a medical obligation to transmit such information; and (4) third-party statements contained in the record are admissible under another hearsay exception or are offered for a nonhearsay purpose. Bouchie, supra at 531. See Wall, supra at 667 (citing four-part Bouchie test).

Even where a proponent establishes these four criteria, a judge retains discretion to exclude portions of otherwise admissible medical records not relevant "to a material issue of the case." Commonwealth v. Copeland, 375 Mass. 438, 442 (1978). See Commonwealth v. Carey, 463 Mass. 378, 387 (2012) (all evidence must meet threshold test of relevancy such that it has "a rational tendency to prove an issue in the case" [quotation and citation omitted]). In addition, a judge may exclude portions of medical records that are "cumulative, repetitive, or confusing" (citation omitted). Commonwealth v. Brown, 449 Mass. 747, 770 (2007). See Mass. G. Evid. § 403.

The Commonwealth contends that the judge properly exercised his discretion to exclude "any portion (or all) of the records as irrelevant [or] . . . any records as to which the probative value is substantially outweighed by their prejudicial impact."

These claims are not supported by the trial record. The judge rejected the prosecutor's argument that postarrest medical records "are too far removed" from the murders "to be relevant to [the defendant's] state of mind." He ruled that the medical records, if relied on by Deters to formulate his opinion, would be admissible. Moreover, the judge did not weigh the probative value of the evidence against the risk of unfair prejudice. See Commonwealth v. Rosario, 444 Mass. 550, 557 (2005); Mass. G. Evid. § 403.

In addition, the Commonwealth maintains that the judge properly exercised his discretion to exclude "thousands of pages of . . . medical records . . . replete with unreliable second-level hearsay," and involving contested, widespread diagnoses not entitled to the presumption of reliability. Although the judge suggested that the parties propose redactions to the voluminous records in a pretrial hearing, and the Commonwealth raised hearsay objections to portions of the medical records, these grounds were not a basis for the judge's ruling. As discussed above, the judge denied the defendant's motion to admit all postarrest medical records in evidence based on an erroneous application of our common-law evidentiary rule limiting the direct examination of an expert witness. There is no support in the record for the Commonwealth's position that the judge exercised his discretion either to pare down

voluminous records or to exclude portions of the records containing unreliable second-level hearsay.

C. Prejudice. Having determined that there was error in the exclusion of the defendant's medical records, we turn to the issue of prejudice. See Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). Where, as here, the defendant preserved the error, "we review for prejudicial error and consider whether there is a reasonable possibility that the error might have contributed to the jury's verdict[s]" (quotation and citation omitted). Commonwealth v. Carriere, 470 Mass. 1, 7 (2014). See Commonwealth v. Sosa, 493 Mass. 104, 114 (2023), cert. denied, 145 S. Ct. 306 (2024) (examining whether error influenced jury or had only very slight effect); Commonwealth v. Rosado, 428 Mass. 76, 79 (1998) (examining whether Commonwealth could show with fair assurance that judgment was not substantially swayed by error).

The Commonwealth raises two arguments why the defendant was not prejudiced from the judge's erroneous ruling. First, the exclusion of the medical records "had no effect on the jury whatsoever since . . . Deters was allowed to regurgitate the highlights of the records which supported his opinion that the defendant was suffering from some sort of psychotic episode when she murdered her two sons." Second, the medical records were not helpful to the defense because they included inculpatory

information, such as documented instances in the weeks and months following the murders in which the defendant appeared alert and orientated with organized and logical thought content,[7] and a diagnosis of adjustment disorder rather than schizophrenia.

Deters was not allowed to "regurgitate the highlights" of the medical records,[8] and thus the records were not cumulative. Cf. Brown, 449 Mass. at 770 (no error from exclusion of cumulative psychiatric medical records where defendant "introduced extensive evidence at trial about his medical condition during the period in which he was hospitalized at Bridgewater [State Hospital], including the detailed testimony

---

[7] The defendant first began to report auditory hallucinations in July 2018, five months after the murders.

[8] There were only two instances where Deters referred to portions of the medical records. He testified, without objection, that the medical records established the defendant's history of hyperthyroidism and vitamin D deficiency, which he cited as a potential explanation for the defendant's psychosis, as "professional literature" has shown "some association . . . between those conditions and psychosis." Deters also testified on redirect examination, over the Commonwealth's objection, that "[b]ased on [his] review of the records . . . [t]here were a number of indications that she was very preoccupied with the Illuminati and videos [on] that [group]." These two references are far from the "highlights" of the medical records. As discussed infra, the medical records reveal far more than the defendant's hyperthyroidism and vitamin D deficiency, both of which were only referenced in passing by Deters. Additionally, family members had already testified to the defendant's preoccupation with the Illuminati.

of four expert witnesses pertaining to observations, evaluations, and the treatment of [the defendant]").  To the contrary, Deters was precluded from testifying on direct examination regarding portions of medical records that supported his opinion that the defendant was "grossly psychotic" at the time she killed her children.  As a result of the ruling, Deters was limited to testifying that he reviewed the defendant's MCI-Framingham and WRCH medical records and that the records were "of significance" or "relevant" in forming his opinion.

The following is a sample of the excluded information contained in the defendant's MCI-Framingham medical records: (1) since her incarceration at MCI-Framingham, the defendant exhibited symptoms of delusional thought content that "appear[ed] episodically acute"; (2) on July 2, 2018, the defendant exhibited signs of paranoid delusions and hallucinations, making statements such as, "I smell gas," "They are poisoning me," and "They are selling my soul to the devil"; (3) a progress note dated September 21, 2018, lists "[o]ther schizophrenia" as a "problem" for the defendant; (4) by November 19, 2018, the defendant had repeatedly exhibited paranoia, hyperreligiosity, and delusional thought content, having frequently assigned significance to random dates and numbers; (5) on February 20, 2019, a counsellor raised the "question of schizophrenia spectrum disorder or schizotypal personality

disorder" as possible diagnoses, noting that the defendant exhibited bizarre behaviors such as licking windows and staring at walls; and (6) on July 23, 2019, the defendant met diagnostic criteria for schizotypal personality disorder and unspecified depressive disorder.

In September 2019, MCI-Framingham petitioned, pursuant to G. L. c. 123, § 18 (a), to transfer the defendant to an inpatient psychiatric hospital because she was "behaviorally out of control."  A judge allowed the petition, and the defendant was committed to WRCH from September 19, 2019, to April 28, 2020.  Medical records from the defendant's psychiatric commitment, not provided to the jury, include the following information:  (1) on September 20, 2019, the defendant exhibited a "bizarre affect," with her speech "pressured, nonsensical and incoherent"; (2) on September 23, 2019, the defendant was diagnosed with "[s]chizophrenia spectrum and other psychotic disorders," with other diagnoses to be ruled out; (3) the results of neuropsychological tests administered from October 18 through December 22, 2019, suggested the defendant suffered from a "psychotic (thought) disorder with a significant tendency to distort reality, especially under emotional stress"; (4) on November 18, 2019, the defendant reported that since the birth of her first child she had been experiencing auditory hallucinations, with delusions that worsened in recent years,

including paranoid delusions about the safety of her sons; (5) also on November 18, the defendant's presentation was determined to be "consistent with paranoid schizophrenia [that was] undetected and untreated for decades"; (6) on April 28, 2020, the defendant was discharged with a diagnosis of "[s]chizoaffective disorder, depressed type."

The Commonwealth is correct that portions of the medical records contain inculpatory evidence. Among the thousands of pages, the records included initial diagnoses inconsistent with Deters's opinion, such as adjustment disorder and depression, and clinical notes documenting the defendant's alert and orientated appearance, with no signs of psychosis. Based on our comprehensive review of the medical records, however, we have no difficulty concluding that the exculpatory MCI-Framingham and WRCH records far exceed those that called into question the defendant's mental illness.

We hold that the exclusion of the MCI-Framingham and WRCH medical records documenting the defendant's postarrest diagnoses or treatment of mental illness, as the defendant argues, impermissibly stripped the sole defense "of the medical foundation that supported it." The defendant is entitled to a new trial.

b.  Closing argument.  Because the issues may arise in a retrial, we address two of the defendant's claims that the prosecutor exceeded the bounds of permissible closing argument.

First, the defendant argues that the prosecutor committed "profound and prejudicial" misconduct by referring to her as "evil" throughout the closing argument.  This "perverse" character attack, she maintains, was calculated to "inflame the passions and prejudices of the jury."

It is important to place disputed portions of a closing argument "in the context of the entire closing, the jury instructions, and the evidence introduced at trial" (citation omitted).  Commonwealth v. Kapaia, 490 Mass. 787, 801 (2022).  A prosecutor is entitled to argue forcefully for the defendant's conviction by marshalling the facts in evidence and fair inferences drawn from those facts.  Commonwealth v. Rutherford, 476 Mass. 639, 643 (2017).  See Commonwealth v. Brown, 496 Mass. 287, 301-302 (2025).  Upsetting facts, "inherent in the odious . . . nature of the crime[] committed," are not off limits where relevant to an issue presented to the jury (citation omitted).  Commonwealth v. Henley, 488 Mass. 95, 131-132 (2021).  See Commonwealth v. Chism, 495 Mass. 358, 404 (2025) (prosecutor's urging of jury to focus on gruesome crime scene photographs permissible where relevant to nature and extent of victim's injuries and defendant's state of mind).  See also Commonwealth

v. Rakes, 478 Mass. 22, 44 (2017) (argument detailing moments leading up to victim's horrific death relevant to theory of extreme atrocity or cruelty). Within this framework, a prosecutor may not use a closing argument to play to the jury's sympathy or emotion. See Commonwealth v. Santiago, 425 Mass. 491, 501 (1997), S.C., 427 Mass. 298 and 428 Mass. 39 (1998) ("appeals to sympathy . . . obscure the clarity with which the jury would look at the evidence and encourage the jury to find guilt even if the evidence does not reach the level of proof beyond a reasonable doubt"). Similarly, "[i]t is improper for a prosecutor to use insulting names designed to evoke an emotional, rather than a rational, response from jurors." Commonwealth v. Lewis, 465 Mass. 119, 130 (2013). See Commonwealth v. Bois, 476 Mass. 15, 34-36 (2016) (impermissible characterization of defendant as "monster"); Lewis, supra (impermissible characterization of defendant as "street thug").

The prosecutor's use of the term "evil," premised on the defendant's own words written in her notebook and spoken in recorded telephone calls, was permissible where related to the defendant's appreciation for the wrongfulness of her conduct. The judge instructed the jury that a person is not criminally responsible for her conduct if, as a result of mental disease or defect, she "lack[s] substantial capacity either to appreciate the criminality or wrongfulness of her conduct or to conform her

conduct to the requirements of the law."  See Commonwealth v. McHoul, 352 Mass. 544, 546 (1967).  See also Commonwealth v. Goudreau, 422 Mass. 731, 737-738 (1996) (Appendix). "Wrongfulness," the judge further instructed, "means the moral significance."  See Commonwealth v. Rezac, 494 Mass. 368, 371 (2024) (wrongfulness refers to "moral import" of conduct).  In this limited fashion, the term "evil" was relevant to an issue raised in the case and not a pejorative label signifying bad moral character.  We trust that on retrial the Commonwealth will use the term, if at all, in this context.

Second, the defendant argues that the prosecutor made baseless claims regarding the television program "Law & Order: Special Victims Unit" (SVU), which was playing on a bedroom television in the defendant's apartment on the day the police discovered the victims' bodies.  The prosecutor argued:

> "You saw in the crime scene video . . . .  My recollection of the evidence that it's Law and Order SVU.  Why does that matter?  The Law and Order SVU I suggest to you, you can use your common sense to decide if that makes a lot of money, if that type of story makes a lot of money."

The prosecutor argued also that the defendant used certain episodes of the television program to concoct her story: "[m]aybe there was something on that [television] that gave her the idea, that helped her come up with not the hallucinations, not the delusions, but the lies."

We recite the relevant trial testimony. On February 5, at an unspecified time during the day, police officers entered the defendant's apartment and discovered Marlon and La'Son's bodies in separate bedrooms. By then, the boys had been deceased "for quite some time" or "a little while." At 8:30 P.M., a State police trooper videotaped the crime scene and captured glimpses of SVU playing on a television in one of the bedrooms. Deters, on cross-examination, admitted that he did not watch the crime scene videotape. The prosecutor then asked Deters:

Q.: "You didn't see the video that showed that on the television was Law and Order [SVU]?"

A.: "No, I never saw that."

. . .

Q.: "Are you familiar with Law and Order [SVU]?"

A.: "Not really. I mean, I've heard of it, certainly, but I don't think I've ever watched an episode of it."

Q.: "So you're not familiar with the fact that there are at least four episodes of women killing kids and claiming voodoo rituals in that?"

A.: "Absolutely no idea. It's the first time I've ever heard that."

The portions of the prosecutor's argument relating to the television program were impermissible. See Commonwealth v. Mack, 482 Mass. 311, 322 (2019) (prosecutor may not misstate evidence or refer to facts not in evidence). No testimony or reasonable inferences drawn from testimony established a

connection between the television program that happened to be playing during the police investigation and the earlier murders. There was no evidence to suggest that the defendant watched episodes of the television program involving child murder and voodoo rituals or copied the plot lines.

3. Conclusion.  For the foregoing reasons, the judgments are vacated, the verdicts are set aside, and the matter is remanded to the Superior Court for a new trial.

So ordered.